UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:24-cv-24749-CMA

FILED BY MCO D.C.
SEP 11 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES OF AMERICA,

ex rel. MARIO MIRABAL,

Relator,

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,

Defendant.

_______________________________________/

# RELATOR'S THIRD NOTICE OF SUPPLEMENTAL DISCLOSURE TO THE UNITED STATES AND NOTICE OF TRANSMISSION OF PRIMARY-SOURCE FORENSIC MATERIALS

Relator Mario Mirabal, proceeding pro se, files this Notice to preserve the chronology, identity, scope, and transmission of supplemental investigative materials supplied to counsel for the United States and the United States Department of Justice on September 9, 2026.

This Notice reports the contents and scope of the September 9, 2026 transmission.

No judicial relief is requested through this Notice.

## I. SEPTEMBER 9, 2026 TRANSMISSION TO THE UNITED STATES

On September 9, 2026, Relator transmitted by electronic mail a supplemental investigative package to:

Mary Beth Ricke

Assistant United States Attorney

Counsel appearing for the United States

with the following Department of Justice component contemporaneously copied:

United States Department of Justice

Civil Division

Commercial Litigation Branch — Fraud Section

The transmission supplemented Relator's August 30, 2026 communication concerning:

a. FDIC FOIA Log No. 2026-FDIC-FOIA-01713; and

b. DOJ Civil Division FOIA Request No. 145-FOI-26-22832.

The September 9 transmission identified two principal developments:

a. subsequent FDIC correspondence concerning the pending Government-record request; and

b. completion and organization of a six-asset controlled pilot and a separate fourteen-asset chronological expansion using recorded assignments, governing securitization agreements, applicable amendments and incorporated instruments, Primary-Source Forensic Reports, asset-specific computational prompts, comparative materials, and institutional-record verification coordinates.

A contemporaneous inventory identifying the materials transmitted and the public archive locations supplied to the United States is attached as Exhibit A.

## II. SIX-ASSET CONTROLLED PILOT

The six-asset controlled pilot consists of six fully reviewed assets.

Each pilot asset was subjected to both:

a. a fixed computational comparison culminating in two threshold questions concerning the apparent validity of the recorded assignment and the authority of the stated assigning entity at the time of the stated transfer; and

b. a deeper integrated primary-source forensic examination comparing the complete recorded instrument or recorded instrument chain against the applicable governing agreement set and relevant institutional chronology.

The transmitted Six-Asset Primary-Source Review reports material primary-source findings for each of the six fully reviewed pilot assets.

The six-pilot set is not confined to one borrower, one trust, one county, or one state.

The preserved investigation identifies recurring personnel, institutional actors, and document-production infrastructure across different borrowers, counties, trusts, and years.

The pilot and related preserved investigation include assignment records identified in multiple jurisdictions, including:

a. Miami-Dade County, Florida;

b. Lee County, Florida;

c. Maricopa County, Arizona; and

d. San Diego County, California.

The preserved Series 2006-H3 recurrence extends from March 2022 through July 2026 and includes repeated FDIC-as-Receiver-to-DBNTC instruments identified in Florida, Arizona, and California.

The six-pilot investigation therefore supplies a cross-jurisdiction investigative set separate from the later Miami-Dade chronological expansion.

## III. FIXED COMPUTATIONAL SCREEN

The fixed comparative prompt culminates in two threshold questions:

“Does the assignment appear valid?”

and

“Was the assigning entity legally authorized to issue this transfer at that time?”

The asset-specific prompts preserve the same fixed two-question formula while substituting only source-controlled information applicable to the particular assignment and governing agreement, including:

a. the year and title of the governing agreement;

b. the year and title of the recorded assignment; and

c. the governing law identified in the governing documents.

The fixed prompt is a reproducible threshold screen.

The prompt is distinct from the deeper Primary-Source Forensic Reports described below.

A reviewer who reruns only the fixed prompt should expect an answer to the two threshold questions.

The reviewer should not expect the short prompt, standing alone, to reproduce every finding developed through the separate integrated forensic review.

## IV. INTEGRATED PRIMARY-SOURCE FORENSIC REVIEW

For each reviewed asset, the deeper forensic examination reads the governing agreement as an integrated whole rather than isolating individual provisions from the conditions, defined capacities, timing restrictions, institutional predicates, and related provisions governing their operation.

Depending upon the applicable governing set, the Primary-Source Forensic Reports examine matters including:

a. the original conveyance structure;

b. Closing Date and Funding Period provisions;

c. Mortgage File delivery requirements;

d. note-delivery and endorsement requirements;

e. Trustee certifications and exception procedures;

f. MERS designations and stated capacities;

g. public-recordation provisions and their contractual predicates;

h. repurchase, substitution, release, liquidation, and return mechanisms;

i. Servicer termination, resignation, assumption, and succession requirements;

j. Trustee duties and restrictions concerning trust assets;

k. institutional and receivership chronology;

l. assignment-generation and production metadata; and

m. cross-asset institutional recurrence.

The six pilot reports therefore constitute completed integrated forensic examinations rather than merely answers to the short computational prompt.

Each Primary-Source Forensic Report states its Computational Finding, identifies the Documentary Basis for that finding, and supplies Asset-Specific Government-Record Coordinates necessary for governmental and institutional verification.

## V. SEPARATE FOURTEEN-ASSET CHRONOLOGICAL EXPANSION

Separate from the six-pilot investigation, Relator fixed the first twenty qualifying Miami-Dade County assignments returned in descending recording-date order as a chronological expansion cohort before completing the governing-agreement comparisons.

The transmitted Fourteen-Asset Chronological Expansion and Executive Synthesis report that fourteen members of that fixed twenty-record cohort have been fully processed.

According to those transmitted reports:

a. all fourteen completed expansion comparisons produced one or more material primary-source findings;

b. none of the fourteen completed comparisons produced a clean result; and

c. fourteen members of the fixed twenty-record expansion cohort already contain findings.

The reported completed-review result is therefore:

14 of 14 completed expansion comparisons produced material findings;

and

0 of 14 completed expansion comparisons produced a clean result.

Because fourteen findings already exist within the fixed twenty-record expansion cohort, the mathematical minimum final finding rate for that cohort cannot fall below:

14 of 20, or 70 percent,

even if each of the six still-unprocessed members of that separate twenty-record expansion cohort ultimately produces no finding.

The 70-percent figure is the arithmetic floor created by fourteen findings already reported within the fixed twenty-record cohort.

For clarity, *the six still-unprocessed members of the twenty-record* expansion cohort are not the six pilot assets.

The six pilot assets were separately and fully reviewed, and the transmitted Six-Asset Primary-Source Review reports material findings for all six.

The six unprocessed expansion records are not counted as findings and are not counted as clean results in the fourteen-of-fourteen completed-review

calculation.

The Executive Synthesis transmitted to the United States is attached as Exhibit B.

## VI. COMBINED COMPLETED REVIEW

The transmitted investigative package reports the following completed-review metrics:

a. six fully reviewed pilot assets producing material primary-source findings;

b. fourteen fully reviewed chronological-expansion assets producing material primary-source findings;

c. twenty completed asset reports in total;

d. seventeen distinct governing agreements across those twenty reports;

e. three governing agreements independently recurring across the pilot and expansion sets;

f. fourteen separate expansion trust series;

g. three recorded transaction-direction categories within the expansion; and

h. more than 400 potentially related Miami-Dade assignment records identified for de-duplication, governing-agreement clustering, and further review.

The fourteen-asset expansion independently returned to three governing agreements already encountered in the six-pilot set:

a. Florez / Dennis — Series 2006-H3;

b. Varela / Birencwajg-Mirabal — IndyMac INDX Mortgage Loan Trust 2007-AR5; and

c. Castro-Ibanez / Rogers — Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2006-D.

The combined package therefore contains twenty completed reports across seventeen distinct governing agreements, with three agreements independently recurring across the pilot and expansion sets.

The three recurring agreements permit comparison of separate borrowers, instruments, execution dates, jurisdictions, and production events against the same governing source set.

The twenty completed reports are not offered as a completed census of the larger identified assignment population.

They are offered as a finite and reproducible primary-source review set capable of being independently tested against governmental and institutional records.

## VII. CROSS-JURISDICTION AND CHRONOLOGICAL RECURRENCE

The transmitted investigative structure contains two different forms of recurrence testing.

First, the six-pilot and related preserved investigation provide cross-jurisdiction recurrence through comparable assignment structures, institutional actors, and document-production channels identified across multiple counties and states.

Second, the fourteen-asset expansion provides chronological county-level recurrence through a separately fixed Miami-Dade cohort established before completion of the governing-agreement comparisons.

The transmitted source package therefore does not depend solely upon a Miami-Dade sample.

It combines a multi-jurisdiction pilot investigation with a separately fixed county-level chronological expansion.

The broader county-record investigation remains subject to de-duplication, governing-agreement clustering, and asset-level review.

## VIII. RECORDED TRANSACTION DIRECTIONS AND SPECIAL FINDINGS

The transmitted expansion materials categorize the fourteen completed assignments into three recorded transaction directions:

a. eleven instruments stating a present transfer from MERS, as mortgagee and nominee for IndyMac Bank, F.S.B., to Deutsche Bank National Trust Company as Trustee;

b. two instruments stating a present transfer from the Federal Deposit Insurance Corporation as Receiver to Deutsche Bank National Trust Company as Trustee or Indenture Trustee; and

c. one instrument stating a present transfer from Deutsche Bank National Trust Company as Trustee to MERS as mortgagee and nominee for IndyMac Bank.

The transmitted expansion materials also identify for institutional verification:

a. the Soto/Capiro Corrective Gap Assignment;

b. the Rodriguez Florida/Missouri collateral-description conflict;

c. the Coleman/Rodriguez one-second production pair, including near-sequential production identifiers and rotating witness/notary roles;

d. the Hart amendment-form trust-name mismatch; and

e. recurring PHH/Onity–MERS–Nationwide Title Clearing production architecture across multiple instruments.

The comparative overview identifies the trust series, county recording identifiers, transaction directions, timing measurements, issue categories, and selected special findings for the fourteen completed expansion assets.

The letter-size Fourteen-Asset Comparative Overview transmitted to the United States is attached as Exhibit C.

## IX. GOVERNMENTAL AND INSTITUTIONAL RECORDS IDENTIFIED IN THE SEPTEMBER 9 TRANSMISSION

The transmitted Primary-Source Forensic Reports identify documentary conflicts through comparison of the recorded assignments, governing agreement sets, applicable amendments, and institutional chronology.

The September 9 transmission separately identified governmental and institutional records bearing upon the related questions of asset history, assignment authority, federal claims or dispositions, payments, and accounting treatment.

The September 9 transmission included a consolidated verification document identifying, where applicable:

a. receivership asset inventories and disposition records;

b. shared-loss claims;

c. reimbursement requests;

d. loss certificates;

e. receivership accounting records;

f. Government payment and disbursement records;

g. Mortgage Loan Schedules and subsequent-transfer schedules;

h. Trustee certifications and exception reports;

i. collateral-custody records;

j. complete note and endorsement histories;

k. MERS investor, Trustee, Servicer, and beneficial-rights histories;

l. servicing succession, assumption, resignation, termination, and delegation records;

m. repurchase, substitution, release, liquidation, and return records;

n. powers of attorney and assignment-authority records;

o. assignment-generation work orders and source-data files;

p. document-template histories;

q. execution-routing records;

r. production and quality-control records; and

s. records concerning Government claims, representations, credits, offsets, recoveries, payments, and accounting treatment associated with the identified assets.

The September 9 transmission identified the unresolved Government-record question as whether any institution:

a. made a federal claim;

b. sought or received a reimbursement or shared-loss payment;

c. obtained receivership funds;

d. received a federal credit or offset; or

e. otherwise caused Government money to be paid or retained in connection with an identified asset.

The September 9 transmission identified the foregoing records as capable of showing whether any federal claim, reimbursement, payment, credit, offset, recovery, receivership disposition, or other Government action depended

upon a representation concerning:

a. ownership;

b. succession;

c. assignment authority;

d. loss status;

e. asset disposition; or

f. entitlement to payment.

The document titled Consolidated Records Necessary for DOJ and FDIC Verification From Governmental and Institutional Custodians was transmitted to the United States, is identified in Exhibit A, and is publicly accessible through the Fourteen-Asset Chronological Expansion Archive.

## X. PUBLIC SOURCE ARCHIVES SUPPLIED TO THE UNITED STATES

The September 9 transmission supplied the following public archive locations:

Six-Asset Pilot Archive

https://archive.org/details/00-howto-use-this-archive

Fourteen-Asset Chronological Expansion Archive

https://archive.org/details/000-advanced-computational-forensics-how-to-use-this-archive

The Six-Asset Pilot Archive contains:

a. the Six-Asset Primary-Source Review;

b. the complete recorded instrument sets for the six pilot assets;

c. corresponding governing agreements and amendments;

d. computational prompts; and

e. supporting source materials.

The Saunders materials include the complete recorded multi-instrument chain rather than only the final 2026 instrument.

The Fourteen-Asset Chronological Expansion Archive contains:

a. the complete Fourteen-Asset Chronological Expansion;

b. the fourteen underlying recorded assignments;

c. the corresponding governing agreement sets;

d. the Executive Synthesis;

e. the comparative forensic overview;

f. the Consolidated Records Necessary for DOJ and FDIC Verification From Governmental and Institutional Custodians; and

g. the asset-specific computational prompts.

The external archive locations are supplied for convenient public access to the larger primary-source sets.

Exhibits A through C are attached directly to this Notice. The additional materials identified in this Notice and the Transmission Manifest remain available at the stated public archive locations.

## XI. PRESENT PROCEDURAL POSTURE

On September 2, 2026, the Court entered a Paperless Order granting Relator's Motion for Extension of Time [ECF No. 56].

ECF No. 55 requested a period of not less than sixty days to permit licensed counsel to complete conflicts review, evaluate the developed record, and enter an appearance.

ECF No. 55 also requested coordination of service with the counsel-search period.

Relator files this Notice during the counsel-search period resulting from ECF No. 56.

This Notice does not seek clarification, modification, enforcement, or reconsideration of ECF No. 56.

Defendant Deutsche Bank National Trust Company has not been served with the summons and Complaint, and no attorney has appeared on Defendant's behalf in this action as of the filing of this Notice.

## XII. PURPOSE AND SCOPE OF THIS NOTICE

This Notice is filed solely to preserve:

a. the date of the September 9, 2026 Government transmission;

b. the identity of the Government recipients;

c. the identity and scope of the materials transmitted;

d. the public source locations provided to the Government;

e. the reported completed six-pilot result;

f. the reported completed fourteen-asset expansion result;

g. the distinction between the six fully reviewed pilot assets and the six still-unprocessed members of the separate twenty-record expansion cohort;

h. the cross-jurisdiction scope of the preserved investigation;

i. the Governmental and Institutional Records verification framework; and

j. the chronology of supplemental disclosure following the United States' August 25, 2026 election.

No judicial relief is requested through this Notice.

Nothing in this Notice waives, limits, abandons, or prejudices any right, claim, objection, remedy, request, or position that may later be asserted by Relator, licensed counsel, the United States, or any authorized Government component.

This Notice does not represent that AUSA Mary Beth Ricke, the Civil

Division Fraud Section, or any other Government component has reviewed, adopted, endorsed, verified, or reached any conclusion concerning the transmitted materials.

## XIII. PRESERVATION OF TRANSMITTED MATERIALS

Relator has preserved copies of the materials transmitted to the United States on September 9, 2026, together with the public archive locations through which the source materials were supplied.

The September 9 transmission requested that the six pilot assets be used as an initial finite Government-record verification set.

The September 9 transmission also requested that the materials be routed, as appropriate, to Government attorneys, investigators, analysts, agents, or agency personnel capable of reviewing the identified Government-record and payment questions.

Relator files this Notice solely to preserve the supplemental disclosure, evidentiary-development, and Government-transmission record.

Respectfully submitted this 11th day of September 2026.

Mario Mirabal

Relator, Pro Se

563 W. 49th Street

Miami Beach, Florida 33140

Mailing Address:

1026 SW 2nd Avenue #304

Miami, Florida 33130

Telephone: 786-479-6596

Email: solphax@gmail.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 11, 2026, I filed the foregoing Relator's Third Notice of Supplemental Disclosure to the United States and Notice of Transmission of Primary-Source Forensic Materials conventionally with the Clerk of the United States District Court for the Southern District of Florida.

I further certify that on September 11, 2026, I served a true and correct copy of the foregoing by United States Mail, postage prepaid, upon:

Mary Beth Ricke

Assistant United States Attorney

United States Attorney's Office

Southern District of Florida

500 East Broward Boulevard, Suite 700

Fort Lauderdale, Florida 33394

Telephone: (954) 660-5137

Email: mary.ricke@usdoj.gov

Counsel for the United States of America

Defendant Deutsche Bank National Trust Company has not been served with the summons and Complaint, and no attorney has appeared on Defendant's behalf in this action as of the filing of this Notice. The foregoing is therefore being served upon counsel for the United States, the only counsel of record presently appearing in this action.

Respectfully submitted,

Mario Mirabal

Relator, Pro Se

EXHIBIT INDEX

EXHIBIT A

SEPTEMBER 9, 2026 TRANSMISSION MANIFEST

EXHIBIT B

EXECUTIVE SYNTHESIS — FOURTEEN-ASSET CHRONOLOGICAL EXPANSION, INCLUDING COMBINED PILOT-AND-EXPANSION METRICS

EXHIBIT C

FOURTEEN-ASSET COMPARATIVE OVERVIEW — LETTER-SIZE CHART

# EXHIBIT A

## SEPTEMBER 9, 2026 TRANSMISSION MANIFEST

Date of Transmission: September 9, 2026

Method of Transmission: Electronic mail

PRIMARY RECIPIENT

Mary Beth Ricke

Assistant United States Attorney

United States Attorney's Office

Southern District of Florida

Mary.Ricke@usdoj.gov

Counsel for the United States of America

COPIED RECIPIENT

United States Department of Justice

Civil Division

Commercial Litigation Branch — Fraud Section

Civil.Fraud@usdoj.gov

EMAIL SUBJECT

U.S. ex rel. Mirabal, No. 1:24-cv-24749-CMA — FDIC Record Development; Audio Investigative Guide; Six-Asset Pilot and Fourteen-Asset Expansion

MATERIALS IDENTIFIED AND TRANSMITTED

1. AUDIO INVESTIGATIVE GUIDE

An approximately one-hour audio briefing addressing the institutional chronology, assignment patterns, Government-record question, and computational forensic methodology.

Public Location:

https://ia801804.us.archive.org/20/items/001-2026-investigators-guide-to-live-mortgage-fraud-rico-enterprise-false-claims/001-2026-Investigators-Guide-to-Live-Mortgage-Fraud-RICO-Enterprise-False-Claims-Act-Whistleblower-2007-AR5-Trust-UNITED-STATES-vs-Deutsche-Bank-PHH-Mortgage-Forensic-Accounting-Computational-Analysis-SEC-Referral-FDIC-OIG-DOJ.mp3

## 2. SIX-ASSET PILOT ARCHIVE

Public Location:

https://archive.org/details/00-howto-use-this-archive

The archive contains:

a. the Six-Asset Primary-Source Review;

b. the complete recorded instrument sets for all six pilot assets;

c. the corresponding governing agreements and amendments;

d. asset-specific computational prompts; and

e. supporting source materials.

The Saunders materials contain the complete recorded multi-instrument chain rather than only the final 2026 instrument.

## 3. FOURTEEN-ASSET CHRONOLOGICAL EXPANSION ARCHIVE

Public Location:

https://archive.org/details/000-advanced-computational-forensics-how-to-use-this-archive

The archive contains:

a. the complete Fourteen-Asset Chronological Expansion;

b. the fourteen underlying recorded assignments;

c. the corresponding governing agreement sets;

d. the Executive Synthesis;

e. the Fourteen-Asset Comparative Overview;

f. the Consolidated Records Necessary for DOJ and FDIC Verification From Governmental and Institutional Custodians; and

g. the asset-specific computational prompts.

4. PRINCIPAL INVESTIGATIVE MATERIALS

The September 9 transmission identified or provided access to:

a. the Six-Asset Primary-Source Review;

b. the Fourteen-Asset Chronological Expansion;

c. twenty asset-specific computational prompts covering the six pilot assets and fourteen expansion assets;

d. the Executive Synthesis;

e. the Fourteen-Asset Comparative Overview;

f. the Consolidated Records Necessary for DOJ and FDIC Verification From Governmental and Institutional Custodians;

g. the underlying recorded assignments and complete recorded instrument chains; and

h. the corresponding Pooling and Servicing Agreements, Sale and Servicing Agreements, amendments, supplements, and governing agreement sets.

5. REPORTED COMPLETED-REVIEW METRICS

The materials transmitted on September 9, 2026 report:

a. six of six fully reviewed pilot assets producing material primary-source findings;

b. fourteen of fourteen completed chronological-expansion comparisons producing material primary-source findings;

c. zero clean completed expansion comparisons;

d. twenty completed asset reports in total;

e. seventeen distinct governing agreements across those twenty reports;

f. three governing agreements independently recurring across the pilot and expansion sets;

g. fourteen separate trust series within the expansion;

h. three recorded transaction-direction categories within the expansion; and

i. more than 400 potentially related Miami-Dade assignment records identified for further de-duplication, governing-agreement clustering, and

review.

## 6. PURPOSE OF MANIFEST

This Manifest identifies the materials and public source locations supplied to the United States on September 9, 2026.

It does not represent that any Government recipient reviewed, adopted, endorsed, verified, or reached any conclusion concerning the transmitted materials.

# EXHIBIT B

## EXECUTIVE SYNTHESIS — FOURTEEN-ASSET CHRONOLOGICAL EXPANSION, INCLUDING COMBINED PILOT-AND-EXPANSION METRICS

The finalized Executive Synthesis PDF transmitted to the United States on September 9, 2026 is attached immediately following this cover page.

# EXECUTIVE SYNTHESIS

## FOURTEEN-ASSET CHRONOLOGICAL EXPANSION

### Numerical Result, Cross-Set Replication, Transaction Directions, and Special Findings

### 1. Fixed Cohort and Numerical Result

Before the governing-agreement comparisons were conducted, the first twenty qualifying Miami-Dade County assignments returned in descending recording-date order were fixed as the chronological expansion cohort. Fourteen of those twenty assignments have now been fully processed against the exact Pooling and Servicing Agreement, Sale and Servicing Agreement, amendment, or other governing instrument identified by the recorded assignment.

All fourteen completed comparisons produced one or more material primary-source findings under the same comparative protocol. None produced a clean result.

The observed completed-review result is therefore:

| Measure | Result |
|---|---|
| Fixed chronological cohort | 20 assignments |
| Comparisons completed | 14 of 20 |
| Completed comparisons producing material findings | 14 of 14 |
| Clean completed comparisons | 0 of 14 |
| Observed finding rate among completed comparisons | 100% |

| | |
|---|---|
| Observed clean rate among completed comparisons | 0% |
| Minimum possible final rate within the fixed twenty-record cohort | 70% |
| Distinct trust series represented in the fourteen-asset expansion | 14 |
| Recorded transaction-direction categories | 3 |
| Governing-agreement bridges to the six-asset pilot | 3 |
| Combined pilot and expansion reports | 20 |
| Distinct governing agreements across the combined twenty reports | 17 |
| Potentially related Miami-Dade assignments identified | More than 400 |

The 70% minimum is not a projection or statistical estimate. It is the mathematical floor created by fourteen findings already established within the fixed twenty-record cohort:

$$ 14 \div 20 = 70\% $$

Even if all six remaining assignments ultimately produced clean results, the final result within the original fixed cohort could not fall below fourteen of twenty.

The fourteen-of-fourteen result is likewise confined to the assignments that have been fully compared. The six unfinished records are not counted as findings and are not counted as clean. The larger population of more than 400 potentially related Miami-Dade assignments remains subject to de-duplication, governing-agreement clustering, and asset-level review. The present expansion is not offered as a completed census or as proof that every record in the larger population contains the same findings. It establishes that a fixed chronological review of the most recent qualifying records produced

material findings in every completed comparison and warrants institutional verification using records unavailable in county and SEC systems.

2. Fourteen Distinct Expansion Trust Series

The fourteen expansion reports do not consist of repeated assignments into a single trust. Each expansion asset names a separate trust series:

IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H3

IndyMac INDX Mortgage Loan Trust 2007-AR5

Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2006-D

IndyMac INDX Mortgage Loan Trust 2006-AR41

IndyMac INDX Mortgage Loan Trust 2007-FLX6

IndyMac INDX Mortgage Loan Trust 2005-AR4

IndyMac INDX Mortgage Loan Trust 2005-AR31

IndyMac INDX Mortgage Loan Trust 2006-AR25

IndyMac INDX Mortgage Loan Trust 2005-AR5

IndyMac INDX Mortgage Loan Trust 2006-AR4

Residential Asset Securitization Trust 2006-A1

Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2007-B

IndyMac INDX Mortgage Loan Trust 2007-AR13

IndyMac INDX Mortgage Loan Trust 2007-FLX4

The findings therefore extend across different trust families, closing dates,

document forms, amendments, Servicer terminology, Trustee capacities, and recorded assignment years. The expansion assignments were executed between 2023 and 2026, while the corresponding governing trust transactions date from 2005 through 2007.

3. Three Governing-Agreement Bridges to the Original Six-Asset Pilot

Three of the fourteen expansion assets independently returned to governing agreements already used in the original six-asset pilot.

A. Series 2006-H3

Pilot asset: Dennis

Expansion asset: Florez

Both assets identify IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H3, and are governed by the same 2006 Sale and Servicing Agreement. Dennis involves a 2026 FDIC-receiver Assignment of Deed of Trust recorded in California. Florez involves a separate 2026 FDIC-receiver Corporate Assignment of Mortgage recorded in Miami-Dade County.

B. INDX 2007-AR5

Pilot asset: Birencwajg/Mirabal

Expansion asset: Varela

Both assets identify IndyMac INDX Mortgage Loan Trust 2007-AR5 and are governed by the same March 1, 2007 Pooling and Servicing Agreement. The baseline instrument was executed in 2010 in the name of IndyMac Bank. The separate Varela instrument was executed in 2023 by MERS as mortgagee and nominee for IndyMac Bank.

C. INABS 2006-D

Pilot asset: Rogers

Expansion asset: Castro/Ibanez

Both assets identify Home Equity Mortgage Loan Asset-Backed Trust, Series INABS 2006-D, and are governed by the same September 1, 2006 PSA and Amendment No. 1. Rogers involves a 2026 MERS assignment. Castro/Ibanez involves a separate 2023 MERS assignment.

These three bridges are significant because they establish both breadth and repeatability:

the fourteen expansion reports involve fourteen separate trust series;

three of those trust series independently reconnect to agreements already tested in the pilot;

the same governing agreement can therefore be tested against more than one borrower, county instrument, assignment date, and production event; and

the combined six-plus-fourteen package contains twenty completed reports across seventeen distinct governing agreements.

The three bridges were not created by selecting additional assignments from the six pilot trusts. They arose within the fixed descending-date expansion cohort.

4. Three Recorded Transaction-Direction Categories

The fourteen assignments fall into three materially different recorded transaction directions.

| Recorded direction | Assets | Count | Percentage |
|---|---|---|---|
| MERS as mortgagee and nominee for IndyMac Bank → DBNTC as Trustee | Varela; Castro/Ibanez; Sclarandi/Bruzzese; Gilbert; Harkatz; McComas; Gomez; Acosta/Scott; Hart; Coleman; Rodriguez | 11 | 78.6% |
| FDIC as Receiver → DBNTC as Trustee or Indenture Trustee | Florez; Caceres | 2 | 14.3% |
| DBNTC as Trustee → MERS as mortgagee and nominee for IndyMac Bank | Soto/Capiro | 1 | 7.1% |
| Total | | 14 | 100% |

This distribution demonstrates that the completed findings are not dependent upon one assignment form.

The eleven MERS-to-DBNTC instruments invoke MERS's nominee relationship with IndyMac Bank and state a present transfer to DBNTC years after the governing agreements state that the Seller-to-Depositor-to-

Trustee conveyances and MERS trust designations were established.

The two FDIC-receiver instruments present a separate chain and authority track: they identify the FDIC as the present assignor and rely upon an attorney-in-fact while conveying to trusts governed by 2006 or 2007 transaction documents.

The Soto/Capiro instrument runs in the opposite direction. It states that DBNTC, acting as Trustee, presently assigns the mortgage outward to MERS as mortgagee and nominee for IndyMac Bank.

The appearance of material findings in all three transaction-direction categories weighs against treating the completed results as a single isolated drafting error confined to one standardized form.

5. Special Findings Within the Expansion

A. Two FDIC-Receiver Assignments

The Florez and Caceres instruments place the FDIC directly in the recorded chain.

Florez identifies the Federal Deposit Insurance Corporation as Receiver for IndyMac Bank, F.S.B. as the present assignor to DBNTC as Indenture Trustee for Series 2006-H3. The July 29, 2026 instrument was signed by Shannon Ortiz as Attorney-in-Fact, requested for recording by Onity Mortgage Corporation, and executed years after the 2006 governing transaction and the IndyMac receivership events.

Caceres identifies the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB, as successor in interest to IndyMac Bank, F.S.B., as the present assignor to DBNTC as Trustee for 2007-FLX4. The assignment's own recitals identify MERS as the original mortgagee and nominee, while the operative assignor is the FDIC. The recorded instrument does not contain the intervening MERS-to-FDIC transfer, release, removal, repurchase, or other chain event connecting those stated capacities.

The two instruments therefore create a distinct Government-record verification track involving:

asset-specific receivership inventory and disposition;

any retained title-curative or assignment authority;

the attorney-in-fact appointment and its effective scope;

the loan-level request and approval for each assignment;

MERS history;

and DBNTC's receipt and treatment of the instrument.

B. Eleven MERS/IndyMac-to-DBNTC Assignments

Eleven of the fourteen instruments identify MERS as mortgagee and nominee for IndyMac Bank, F.S.B., its successors and assigns, and state that MERS presently assigns the mortgage to DBNTC as Trustee.

Although the eleven instruments involve different borrowers and fourteen-series expansion architecture, the reports repeatedly identify the same central comparison points:

the governing agreement's completed Seller-to-Depositor-to-Trustee transaction;

the required MERS identification of DBNTC and the certificate series;

restrictions on changing that trust-identifying information absent repurchase;

finite Mortgage File, certification, cure, purchase, and substitution periods;

a MERS-to-Seller direction upon repurchase;

a Trustee-nominee capacity for later servicing-related MERS instruments;

and defined termination, resignation, predecessor-Servicer, successor-Servicer, assumption, filing, delivery, rating-agency, and notice requirements for Servicer succession.

The recurrence of the same transaction direction across eleven different trust series allows investigators to test the pattern through centralized MERS, Servicer, Trustee, and document-production records rather than treating each assignment as an unrelated borrower-level event.

C. Soto/Capiro Reverse "Corrective Gap Assignment"

The Soto/Capiro instrument is the only completed expansion assignment running from DBNTC as Trustee back to MERS as mortgagee and nominee for IndyMac Bank.

The instrument is titled a "Corrective Gap Assignment" and states that it was intended to remedy a gap between assignments recorded in October 2011 and April 2012. It was not executed during that interval. It was newly executed on July 14, 2026.

Its operative language states that DBNTC as Trustee presently assigns the mortgage to MERS. It does not identify an earlier execution date, retroactive effective date, previously completed transfer, repurchase, substitution, payoff, liquidation, or other governing-agreement transaction supporting the outward transfer. The original-principal-sum field is blank.

This instrument is significant because it does more than repeat the prevailing MERS-to-Trustee form. It reverses the direction of the recorded chain and attempts to insert a newly executed 2026 conveyance into a gap identified between two 2011–2012 instruments.

D. Rodriguez Florida/Missouri Collateral Conflict

The Rodriguez assignment contains a direct internal collateral-description conflict independent of the broader governing-agreement comparison.

Page 1 identifies a Jorge Rodriguez mortgage recorded in Miami-Dade County, Florida. The recorded Exhibit A on page 2 describes:

Lot 39, Village Highlands, a subdivision in Greenwood, Jackson County, Missouri.

Both pages were recorded together under Miami-Dade County CFN 20230197635. The assignment contains no qualification, replacement page, alternate parcel explanation, or statement excluding the Missouri exhibit. The instrument therefore does not consistently identify the collateral it purports to assign.

This creates an immediately testable document-production question: what source file, title report, legal-description image, data field, or production batch supplied the Missouri exhibit to the Miami-Dade assignment?

E. Coleman/Rodriguez One-Second Production Pair

The Coleman and Rodriguez assignments establish a tightly grouped production sequence involving separate borrowers and separate trusts.

Both were:

executed on March 21, 2023;

signed by Kelley Earle as MERS Assistant Secretary;

prepared by Benedicth Francois;

generated through the PHH/Nationwide Title Clearing channel;

produced under the OCWEN-NVLER and FRMFL1_PHH02 designations; and

recorded in Miami-Dade County on March 24, 2023.

Their production timestamps are one second apart:

Coleman: T152303-12:34:25

Rodriguez: T152303-12:34:26

Their document identifiers are near-sequential:

Coleman: D0099876799

Rodriguez: D0099876802

Their county recording times are two minutes and twenty-five seconds apart:

Coleman: 8:49:25 a.m.

Rodriguez: 8:51:50 a.m.

The execution roles also rotate within the pair:

Coleman: Netty N. Bangala — witness; Gwen Murakami — notary.

Rodriguez: Gwen Murakami — witness; Netty N. Bangala — notary.

Kelley Earle remains the MERS signer, Melisia Thompson remains a witness, and Benedicth Francois remains the preparer. The Rodriguez instrument generated within this same production sequence contains the Missouri legal-description exhibit.

The pair supplies a defined batch for institutional retrieval. PHH, MERS, and Nationwide Title Clearing should be able to identify the adjacent document queue, source-data transmissions, template versions, quality-control review, execution routing, and every document generated

immediately before, between, and after the two listed document identifiers.

F. Hart Amendment-Form Trust-Name Mismatch

The Hart governing set includes Amendment No. 1 to the Residential Asset Securitization Trust 2006-A1 PSA.

The replacement-Servicer Sarbanes-Oxley certification form included with the amendment is captioned:

"Re: IndyMac INDX Mortgage Loan Trust 2006-A1"

The base PSA, amendment title page, and Hart assignment instead identify:

Residential Asset Securitization Trust 2006-A1

The present source set does not show whether the form was later corrected, whether it was used, or what replacement-Servicer certification was supplied for the actual RAST 2006-A1 trust. The mismatch identifies a particular succession and reporting record for institutional verification rather than a name that may be silently substituted.

G. Recurring PHH/Onity–Nationwide Production Architecture

The fourteen reports document a recurring production architecture

involving:

PHH Mortgage Corporation;

Onity Mortgage Corporation, formerly PHH;

Nationwide Title Clearing, LLC;

repeated West Palm Beach and Mount Laurel production addresses;

PHH reference numbers;

MERS MINs;

OCWEN-NVLER production designations;

document identifiers;

closely grouped production timestamps;

recurring preparers;

and individuals appearing in different recorded signer, witness, and notary roles.

For example, the Harkatz, McComas, and Gomez reports identify the same 5720 Premier Park Drive production location, LaVar Jones as preparer, the PHH/Onity–Nationwide channel, and recurring individuals changing recorded roles across instruments involving different borrowers and different trust series.

The recorded role recurrence does not, by itself, determine the authority or intent of any individual. It identifies a common production system capable of being verified through work orders, source-data files, template histories, signing queues, notarial records, electronic-recording packages, and quality-control logs.

6. Combined Investigative Significance

The six-asset pilot establishes the depth of the primary-source method. The fourteen-asset chronological expansion establishes that the method continues to produce material findings outside the original pilot.

The combined package now presents:

twenty completed asset reports;

seventeen distinct governing agreements;

three governing agreements independently recurring across the pilot and expansion sets;

fourteen distinct trust series within the expansion;

three materially different recorded transaction directions;

two FDIC-receiver assignments;

eleven MERS/IndyMac-to-DBNTC assignments;

one reverse DBNTC-to-MERS assignment;

a reverse corrective-gap transaction;

a cross-state collateral-description conflict;

a one-second production pair with near-sequential document identifiers;

an amendment-form trust-name mismatch;

and a recurring PHH/Onity–MERS–Nationwide production architecture.

The findings are therefore not confined to:

one borrower;

one property;

one county document;

one trust;

one governing agreement;

one assignment year;

one assignor form;

one signer;

one Servicer;

or one claimed transaction direction.

At the same time, the present reports do not substitute for the governmental and institutional records needed to establish the complete asset histories. The recorded assignments and public governing agreements establish the documentary comparison. The remaining records must determine:

whether and when each asset entered the stated trust;

whether the complete Mortgage File was delivered and accepted;

what MERS reflected regarding investor, Trustee, trust series, beneficial-rights holder, and Servicer;

whether any repurchase, substitution, release, liquidation, or return occurred;

whether a valid Servicer succession occurred;

who requested and authorized each later assignment;

what source data was used to generate it;

whether the FDIC retained or acquired asset-specific authority;

how DBNTC received and treated the instrument;

and whether any Government claim, reimbursement, shared-loss request, payment, credit, offset, recovery, or receivership accounting entry was associated with the same asset.

7. Investigative Conclusion

The numerical result does not depend on extrapolating fourteen records to the entire 400-plus population.

It establishes a narrower but substantial proposition:

Within a fixed twenty-record chronological cohort, fourteen assignments have been fully compared with their exact governing agreements. All fourteen completed comparisons produced material primary-source findings, yielding a completed-review result of fourteen of fourteen and a clean result of zero of fourteen. Because fourteen findings already exist within the fixed cohort, the final cohort rate cannot fall below seventy percent, even if every remaining assignment produces no finding.

The documentary result establishes an additional proposition:

The findings recur across fourteen separate expansion trust series, three recorded transaction directions, two FDIC-receiver instruments, eleven MERS/IndyMac-to-DBNTC instruments, one reverse Trustee-to-MERS

instrument, and a recurring institutional production architecture. Three expansion assets independently return to governing agreements already tested in the six-asset pilot.

The larger identified Miami-Dade population therefore presents a bounded, searchable, and potentially high-yield institutional-record inquiry. The enclosed asset coordinates and consolidated records-verification section permit DOJ, FDIC, DBNTC, MERS, PHH/Onity, Nationwide Title Clearing, and other custodians to confirm, narrow, or refute each finding using their own contemporaneous records.

# EXHIBIT C

## FOURTEEN-ASSET COMPARATIVE OVERVIEW — LETTER-SIZE CHART

The finalized one-page letter-size comparative chart transmitted to the United States on September 9, 2026 is attached immediately following this cover page.

# FOURTEEN-ASSET PRIMARY-SOURCE FORENSIC OVERVIEW

## 2005-2007 Governing Trust Transactions Compared With Newly Executed 2023-2026 Recorded Assignments

| | | | | |
|---|---|---|---|---|
| **14** ASSETS | **14** EXACT GOVERNING TRANSACTION AGREEMENTS | TRUST CLOSINGS: **2005-2007** | ASSIGNMENTS EXECUTED: **2023-2026** | ELAPSED TIME: **5,761 TO 7,827 DAYS** |

| | | |
|---|---|---|
| **11** MERS/INDYMAC -> DBNTC TRUSTEE | **2** FDIC RECEIVER -> DBNTC TRUSTEE | **1** DBNTC TRUSTEE -> MERS/INDYMAC REVERSE ASSIGNMENT |

Each row compares the governing trust transaction date with the later recorded assignment execution date and highlights the primary documentary conflict pattern.

| No. | Asset / Trust | Timeline (2004-2027) 2004 · 2008 Receivership · Receivership / Asset Sale · 2010 · 2016 · 2018 · 2020 · 2022 · 2024 · 2026 | Closing -> Assignment Execution (MM/DD/YYYY) | Days | Stated Direction | Issue Codes | Principal Poster Flag |
|---|---|---|---|---|---|---|---|
| 1 | Florez<br>2006-H3 \| CFN 20260525?? | | 09/29/2006 -> 07/29/2026 | 7,243 | FDIC-R for IndyMac Bank -> DBNTC | C/R/S/F | Present FDIC conveyance; attorney-in-fact authority |
| 2 | Varela<br>2007-AB5 \| CFN 20230697369 | | 03/29/2007 -> 09/22/2023 | 6,021 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/P | MERS capacity; PHH-NTC channel |
| 3 | Castro / Ibanez<br>INABS 2006-D \| CFN 20230169613 | | 09/13/2006 -> 03/09/2023 | 6,021 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/P | Funding Period ended 10/13/2006 |
| 4 | Sclarandi / Bruzzese<br>2006-AR41 \| CFN 20260526801 | | 12/28/2006 -> 07/23/2026 | 7,147 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/P | Amendment unchanged; Only-NTC recurrence |
| 5 | Gilbert<br>2007-FLX5 \| CFN 20230466109 | | 07/30/2007 -> 06/29/2023 | 5,813 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S | Initial transfer, repurchase, succession conflict |
| 6 | Harkatz<br>2005-AR31 \| CFN 20260485450 | | 11/29/2005 -> 07/07/2026 | 7,525 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/P | Signer/notary role recurrence; Only-NTC |
| 7 | Soto / Capiro<br>2005-AR4 \| CFN 20260508504 | | 02/07/2005 -> 07/14/2026 | 7,827 | DBNTC as Trustee -> MERS as nominee for IndyMac | C/M/R/S/X | Reverse corrective gap assignment; blank principal field |
| 8 | McComas<br>2006-AR25 \| CFN 20260375686 | | 07/28/2006 -> 05/26/2026 | 7,242 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/P | Servicer succession; reporting trail |
| 9 | Gomez<br>2005-AB5 \| CFN 20250424823 | | 03/30/2005 -> 05/27/2025 | 7,363 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/P | PHH-NTC production architecture |
| 10 | Acosta / Scott<br>2006-AR4 \| CFN 20250385499 | | 03/31/2006 -> 04/28/2025 | 6,968 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/P | Succession; Form 8-K trail |
| 11 | Hart<br>RAST 2006-A1 \| CFN 20240841596 | | 02/27/2006 -> 10/31/2024 | 6,821 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/X | Amendment trust-name mismatch |
| 12 | Coleman<br>INABS 2007-B \| CFN 20230197619 | | 06/12/2007 -> 03/21/2023 | 5,761 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/P/X | One-second production pair |
| 13 | Rodriguez<br>2007-AR13 \| CFN 20230197635 | | 05/30/2007 -> 03/21/2023 | 5,774 | MERS as nominee for IndyMac -> DBNTC | C/M/R/S/P/X | Missouri exhibit attached to Miami-Dade assignment |
| 14 | Caceres<br>2007-FLX4 \| CFN 20230370453 | | 05/30/2007 -> 05/17/2023 | 5,831 | FDIC-R for IndyMac Federal -> DBNTC | C/M/R/S/F/X | FDIC/MERS chain discontinuity |

### Recurring Verification Themes

1. Trust acquisition and Mortgage Loan Schedule
2. Mortgage File custody and Trustee certifications
3. MERS milestone history and principal identification
4. Repurchase, substitution, release, and return records
5. Servicer succession, transfer, and notice records
6. Assignment-generation work orders, vendor files, and county submission packages

### Selected Special Defects

1. Rodriguez: Missouri legal description attached to Miami-Dade assignment
2. Soto/Capiro: reverse-direction corrective gap assignment
3. Coleman and Rodriguez: one-second production timestamps; near-sequential document identifiers
4. Hart: amendment form carries different trust name
5. Caceres and Florez: FDIC receiver / attorney-in-fact authority track

### Issue Code Legend

- **C** = Governing conveyance and finite-period conflict
- **M** = MERS principal or capacity conflict
- **R** = Repurchase or return direction not shown
- **S** = Servicer succession predicates or records not identified
- **F** = FDIC receivership or attorney-in-fact authority issue
- **P** = Recurring PHH/Only-Nationwide production architecture
- **X** = Special asset-level defect

### Archive Link / QR Placeholder

Found in Filling
[redacted]

Full fourteen-asset reports and source index available in linked archive.

This exhibit presents a primary-source documentary comparison. It does not adjudicate falsity or individual intent. The governmental and institutional records identified in the accompanying report are necessary to confirm or refute each asset-level transaction history.